**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. DANIELS, | ) | CASE NO. 1:13-CV-01044 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Michael L. Daniels ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1381 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below,

the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

## I.   PROCEDURAL HISTORY

On July 20, 2010, Plaintiff filed applications for DIB, POD, and SSI and alleged a

disability onset date of January 31, 2009.  (Tr. 11.)  The applications were denied

initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On November 16, 2011, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff appeared, was represented by an attorney, and testified.  (*Id.*)  A vocational expert ("VE") also testified.  (*Id.*)  On December 29, 2011, the ALJ found that Plaintiff was not disabled.  (Tr. 8.)  On March 27, 2013, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision.  (Tr. 1.)  On May 8, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos. 15, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ improperly evaluated the opinion of Plaintiff's treating physician; and (2) the ALJ's residual functional capacity finding did not accurately account for Plaintiff's limitations.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in March 1960 and was 48-years-old on the alleged disability onset date.  (Tr. 18.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as a construction worker.  (*Id.*)

### B.  Medical Evidence[1]

#### 1.  Medical Reports

Records from Lakewood Hospital reveal that Plaintiff was treated at the

---

[1]     Although Plaintiff's record contains some evidence of a mental impairment, the ALJ concluded that Plaintiff does not have a severe mental impairment.  (Tr. 14.)  Plaintiff does not challenge this conclusion in his Brief.  As a result, the following discussion of the medical evidence addresses only that evidence which relates to Plaintiff's physical condition.

emergency room on December 30, 2009, after falling off of his bicycle.  (Tr. 274.)  A computed tomography (CT) scan of Plaintiff's head and cervical spine revealed a right frontal scalp laceration/hematoma; diffuse idiopathic skeletal hyperostosis; and fusion at C4-5.  (Tr. 276-277.)  Plaintiff was discharged with a diagnosis of a closed head injury, cerebral contusion, hypokalemia, and a history of migraines.  (Tr. 275.)

On July 5, 2010, Plaintiff reported to the emergency room with complaints of dizziness and a headache.  (Tr. 309.)  He was alert and in no acute distress.  (*Id.*)  He appeared well, his gait was within normal limits, and he was judged not to be at risk for a fall.  (*Id.*)  A CT scan of his brain without contrast was performed and the findings were normal. (Tr. 333.)  Plaintiff was discharged with a diagnosis of dizziness and vertigo.  (Tr. 314.)

On July 9, 2010, Plaintiff began seeing Philip Tomsik, M.D., for dizziness, shoulder and back pain, and migraines.  (Tr. 365.)  Plaintiff reported having migraines one to two times per month.  (*Id.*)  He stated that he experienced migraines more often when he lived in Maryland, and that the migraines used to be treated with a shot of Demerol.  (*Id.*)  Plaintiff also complained of bilateral shoulder pain.  (*Id.*)  Dr. Tomsik diagnosed vertigo and rotator cuff syndrome, not otherwise specified (NOS).  (Tr. 366.)  He ordered Plaintiff to complete exercises to treat his dizziness and prescribed Naproxen.  (*Id.*)  He also ordered physical therapy for Plaintiff's shoulder pain.  (*Id.*)

Plaintiff began outpatient physical therapy in July 2010.  (Tr. 403.)  During his initial evaluation, Plaintiff reported that he had shoulder pain for the previous three months and that the pain increased when he elevated his arm when reaching.  (*Id.*)  He

3

also reported that he experienced migraines one to two times a month.  (*Id.*)  Plaintiff

stated that he rode his bike, was looking for work, and donated plasma twice a week.

(*Id.*)  On examination, Plaintiff displayed protracted shoulders and a forward head.  (*Id.*)

He had mild tenderness to touch in his right shoulder.  (*Id.*)

On July 19, 2010, Plaintiff reported to Dr. Tomsik that his shoulder pain had

become worse and that he was also experiencing neck pain.  (Tr. 363.)  Plaintiff stated

that he had gone to physical therapy, but that it had made his pain worse and

decreased his range of motion.  (*Id.*)  Plaintiff complained of severe pain in the muscles

around his neck and shoulders and reported difficulty sleeping.  (*Id.*)  Dr. Tomsik

administered a Lidocaine injection.  (Tr. 364.)  He also prescribed Percocet and ordered

Plaintiff to continue physical therapy.  (*Id.*)  On July 22, 2010, Plaintiff reported that he

felt 100 percent better after receiving a cortisone shot.  (Tr. 295.)

On August 5, 2010, Plaintiff called his physical therapist to ask whether he

should continue with therapy.  (Tr. 298.)  Plaintiff reported that he was still having neck

and shoulder pain.  (*Id.*)  He also reported exercising more than once a day.  (*Id.*)  The

physical therapist discussed with Plaintiff decreasing his strengthening exercises to

once a day.  (*Id.*)

On August 17, 2010, Plaintiff saw a neurologist for his headaches.  (Tr. 361.)  He

reported having headaches for the past twenty years.  (*Id.*)  He stated that his

headaches were constant and that he experienced very severe headaches four to five

times a month.  (*Id.*)  Plaintiff also complained of back pain and right shoulder pain.

(*Id.*)  The neurologist prescribed Neurontin and Maxalt for Plaintiff's migraines and

4

ordered an MRI of Plaintiff's cervical spine and an x-ray of his shoulder.  (Tr. 362.)  An August 23, 2010, MRI of Plaintiff's cervical spine showed extensive degenerative changes, which were greater than expected for his age.  (Tr. 330.)  No pathologic process was seen in the x-ray of Plaintiff's shoulder.  (Tr. 331.)

On August 24, 2010, Plaintiff reported to Dr. Tomsik with complaints of a migraine lasting three days.  (Tr. 477.)  Plaintiff stated that the Maxalt prescribed by the neurologist "made him feel funny and kept him awake."  (*Id.*)  Plaintiff said the Neurontin helped for the first few days but then stopped working.  (*Id.*)  Plaintiff explained that the migraine pain started at the base of his skull and then expanded forward over the top of his head.  (*Id.*)  Plaintiff also stated that he continued to have shoulder pain but that it improved after the injection.  (*Id.*)  On examination, Plaintiff's right shoulder showed improved range of motion from previous exams.  (Tr. 478.)  Plaintiff appeared in mild discomfort from pain, but was able to be redirected and appeared more comfortable while in conversation during the interview.  (*Id.*)  Dr. Tomsik diagnosed Plaintiff with degenerative disc disease and arthritis.  (*Id.*)  He refilled Plaintiff's prescription for Percocet, referred Plaintiff to an orthopedist, prescribed Voltaren, gave him a trial of Zomig, and discontinued Maxalt.  (*Id.*)

On October 26, 2010, Plaintiff returned to Dr. Tomsik and requested stronger pain medication.  (Tr. 357.)  Plaintiff complained of bad headaches and neck pain.  (*Id.*)  He reported that he had an orthopedic spine consultation scheduled for that week, but that he could not afford the five dollar co-pay.  (*Id.*)  On examination, Plaintiff was tender in his cervical spine and had decreased range of motion.  (Tr. 358.)  Dr. Tomsik

5

prescribed Daypro, increased Plaintiff's dosage of Neurontin, and referred him to a pain management specialist.  (*Id.*)

In March 2011, Plaintiff reported to Dr. Tomsik that he had stopped taking the Neurontin because it was making him sick.  (Tr. 469.)  Plaintiff stated that the Lidoderm patches and heating pads were helping his pain but that his neck pain was unchanged. (*Id.*)

On November 14, 2011, Dr. Tomsik completed a questionnaire regarding Plaintiff's condition.  (Tr. 485.)  Dr. Tomsik listed Plaintiff's confirmed diagnoses as cervical spinal stenosis, extensive degenerative changes of the cervical spine, migraines, chronic headaches, rotator cuff syndrome, and lumbar spondylosis.  (Tr. 485.)  Dr. Tomsik reported that Plaintiff symptoms included headaches, severe back pain, severe head pain, migraine, nausea, and weakness.  (*Id.*)  Dr. Tomsik opined that Plaintiff could sit for three to four hours during an eight-hour workday and could stand and walk less than two hours.  (*Id.*)  According to Dr. Tomsik, Plaintiff could occasionally lift ten pounds.  (Tr. 486.)  Dr. Tomsik concluded that Plaintiff's condition would cause him to miss work one day a week and five to six times a month.  (*Id.*)  Dr. Tomsik noted that Plaintiff continued to have severe pain despite pain medication, non-steroidal anti-inflammatory drugs (NSAIDs), Lidoderm patches, and muscle relaxants. (*Id.*)

On January 9, 2012, Plaintiff saw Cynthia Barnford, M.D., at the request of Dr. Tomsik, for an evaluation of Plaintiff's headaches.  (Tr. 492.)  Plaintiff reported that he had been getting headaches since he was fifteen years old.  (Tr. 492.)  He stated that

6

his headaches were severe with photo and phonophobia and nausea, and that they became constant about ten years ago.  (*Id.*)  Plaintiff explained that the pain started in his neck and expanded, and that he had sensitivity to light and sound when his headaches were severe.  (*Id.*)  Plaintiff also noted that movement made his headaches worse.  (*Id.*)  On examination, Plaintiff was alert and oriented, his affect was normal, and his speech was spontaneous and fluent.  (Tr. 494.)  His short and long term memory, cognition, and general knowledge were good, and his attention span and concentration were excellent.  (*Id.*)  He had normal muscle tone and strength.  (Tr. 495.)  Dr. Barnford diagnosed Plaintiff with chronic migraine with a cerviogenic component and chronic neck pain.  (*Id.*)

    **2.**        **Agency Reports**

        **a.**     **Dr. Saghafi**

On October 5, 2010, Mehdi Saghafi, M.D., performed a consultative examination of Plaintiff.  (Tr. 337.)  Based on Plaintiff's history and objective physical findings, Dr. Saghafi opined that Plaintiff could sit, stand, and walk five to six hours per day and did not require an ambulatory aid.  (Tr. 341.)  According to Dr. Saghafi, Plaintiff could frequently lift and carry 20 pounds and could occasionally lift and carry 21-40 pounds.  (*Id.*)  Plaintiff could push and pull lightweight objects, manipulate objects, and occasionally operate hand and foot controlled devices.  (*Id.*)  He could drive, travel, and climb stairs.  (*Id.*)  Plaintiff's speech, hearing, memory, orientation, and attention were within normal range.  (*Id.*)  Dr. Saghafi diagnosed degenerative arthritis of the cervical spine, degenerative arthritis of the lumbar spine, and headaches.  (*Id.*)

7

On April 26, 2011, Dr. Saghafi conducted a second consultative examination of Plaintiff.  (Tr. 389.)  Following his examination of Plaintiff, Dr. Saghafi opined that Plaintiff could sit, stand, and walk for three to four hours a day.  (Tr. 391.)  Plaintiff could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds.  (Tr. 391.)  He could push and pull lightweight objects, manipulate objects, and operate hand and foot controlled devices.  (*Id.*)  Plaintiff could drive, travel, and climb stairs.  (*Id.*)  His speech, hearing, memory, orientation, and attention were within normal range.  (*Id.*)  Dr. Saghafi diagnosed residual strain of the right shoulder, degenerative arthritis of the cervical spine, and degenerative arthritis of the lumbar spine.  (Tr. 391.)

### b.   Dr. Lewis

On November 5, 2010, state agency medical consultant Elaine M. Lewis, M.D., reviewed Plaintiff's medical records and determined that Plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry twenty-five pounds.  (Tr. 68.)  Dr. Lewis opined that Plaintiff was capable of standing and/or walking and sitting for about six hours in an eight-hour workday.  (*Id.*)  According to Dr. Lewis, Plaintiff had no pushing or pulling restrictions, but he could never climb ladders, ropes, or scaffolds and could only occasionally stoop, kneel, crawl and crouch.  (Tr. 68-69.)  Further, Dr. Lewis opined that Plaintiff was limited in his ability to reach due to the decreased range of motion in his shoulders.  (Tr. 69.)  Dr. Lewis also concluded that Plaintiff should avoid all exposure to unprotected heights due to the limited range of motion in his spine and shoulders.  (Tr. 70.)

### C.   Hearing Testimony

8

### 1.      Plaintiff's Testimony

Plaintiff was 51-years-old at the time of his hearing.  (Tr. 30.)  He obtained his GED and had training in several areas such as heavy equipment operation, building, framing, plumbing, and home construction.  (*Id.*)  He last worked in November 2009 at a factory assembling plastic parts.  (*Id.*)  He only worked at that job for two days, because he could not handle the constant standing.  (Tr. 31.)  At Plaintiff's last full-time job in December 2008, he operated a lift.  (*Id.*)  He worked at that job for two weeks before the job was "shut down."  (*Id.*)  Plaintiff also had past work installing lab equipment and performing other construction work.  (Tr. 31-32.)

Plaintiff testified that he experienced constant migraines.  (Tr 32.)  About three or four years ago, he started getting migraines two or three times per week.  (Tr. 32-33.)  He had missed worked in the past due to migraines.  (Tr. 33.)  The migraines sometimes lasted ten to twelve hours.  (*Id.*)  He took Soma, which relieved the migraines somewhat but made him feel disoriented.  (*Id.*)

Plaintiff also had problems with his neck due to arthritis.  (Tr. 32, 33.)  He experienced pain when he turned his head or looked up or down.  (Tr. 33.)  He also had pain in his middle and lower back.  (Tr. 34.)  He took Soma for the pain and used a heating pad and a TENS unit.  (*Id.*)  He also received nerve block shots that helped his pain for three or four days.  (Tr. 35.)  For his arthritis, Plaintiff took Daypro, which caused stomach aches and dizziness.  (Tr. 38.)  Plaintiff could be on his feet for about an hour or two until his back started hurting.  (Tr. 35.)  He could not sit comfortably unless he had a heating pad.  (*Id.*)  He could walk for a couple of blocks before his back

9

began to hurt.  (Tr. 36.)  He could lift a gallon of milk but it made his back hurt.  (*Id.*)

Plaintiff lived with his fiancé.  (*Id.*)  They shared responsibility for the household chores.  (*Id.*)  Plaintiff could do chores for about fifteen to twenty minutes before having to take a break.  (Tr. 37.)  He could vacuum, take out the trash, and do the dishes.  (*Id.*)  Plaintiff used to go fishing but stopped about five years ago due to his neck and back pain.  (*Id.*)  He did not have difficulty watching television or using the computer.  (Tr. 37-38.)

### 2.    VE Testimony

Dr. Oestreich, a rehabilitation counselor, testified as a vocational expert at Plaintiff's hearing.  (Tr. 39.)  The VE testified that the work Plaintiff performed in the past 15 years was considered heavy, semiskilled construction work.  (Tr. 40.)

The ALJ asked the VE to consider a hypothetical individual age 51 who has the equivalent of a high school education and training in the plumbing trade.  (Tr. 41.)  The individual is limited to a range of light work, meaning he can sit, stand, or walk for six hours each during an eight-hour day.  (*Id.*)  Furthermore, the individual can lift, carry, push, or pull ten pounds frequently and 20 pounds occasionally; he cannot use ladders, ropes, or scaffolds; he can occasionally stoop, kneel, crouch, and crawl; and he can occasionally work overhead, above shoulder level, with his right arm, which is his dominant side.  (*Id.*)  The VE testified that the hypothetical individual would be unable to perform any of the work Plaintiff performed in the past.  (Tr. 41-42.)

The ALJ then asked the VE whether there are jobs in the national or regional economy that an individual with the hypothetical worker's age, education, work

10

experience, and limitations could perform.  (Tr. 42.)  The VE testified that the limitations regarding the individual's dominant arm would reduce the full range of light work, and that the individual could perform about 60 percent of light work.  (*Id.*)  According to the VE, the individual could perform such jobs as an assembler, a housekeeper, and a sorter.  (Tr. 43.)

Plaintiff's counsel asked the VE to change the ALJ's hypothetical so that the individual was only capable of sitting for three to four hours and standing/walking for three to four hours.  (Tr. 43-44.)  The VE testified that the individual could perform about 30 to 35 percent of light work.  (Tr. 44.)  The VE further testified that an individual who missed at least two days of work a month would not be capable of performing the jobs the VE previously identified, nor would the individual be able to work if he was off task for about 20 percent of the workday due to pain.  (*Id.*)  The VE also stated that an individual who had to look straight ahead at all times would probably not be able to work due to safety concerns.  (Tr. 45.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet

11

certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      Plaintiff meets the insured status requirements of the Act through September 30, 2012.

2.     Plaintiff has not engaged in substantial gainful activity since January 31, 2009, the alleged onset date.

3.     Plaintiff has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, a right rotator cuff injury, and headaches.

4.     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     Plaintiff has the residual functional capacity to do a range of light work. Specifically, he can lift, carry, push, or pull 10 pounds frequently and 20 pounds occasionally, and can sit, stand, and/or walk for 6 hours each in an 8-hour workday, with normal breaks.  He can never use ladders, ropes, or scaffolds.  He can occasionally stoop, kneel, crouch, and crawl. He can only occasionally work above shoulder level with the right arm, which is his dominant arm.

6.     Plaintiff is unable to perform any past relevant work.

7.     Plaintiff was born in March 1960.  He was 48-years-old, a "younger" individual age 18-49, on the alleged disability onset date.  On his 50th birthday in March 2010, his age category changed to "approaching advanced age."

8.     Plaintiff has at least a high school education and is able to communicate in English.

. . . . .

10.    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.    Plaintiff has not been under a disability, as defined in the Act, on or after January 31, 2009, through the date of this decision.

(Tr. 13-19.)

## LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### a.  The ALJ Improperly Evaluated the Opinion of Plaintiff's Treating Physician.

Plaintiff argues that the ALJ erred when evaluating the opinion of Plaintiff's treating physician, Dr. Tomsik.  Dr. Tomsik opined that Plaintiff would be capable of sitting three to four hours throughout an eight-hour workday, standing/walking for less

14

than two hours in an eight-hour workday, and lifting ten pounds occasionally.  (Tr. 485-486.)  In evaluating Dr. Tomsik's opinion, the ALJ stated: "I gave less weight to this opinion because the evidence of record including the treatment notes does not support it."  (Tr. 17.)  Plaintiff argues that the ALJ erred by failing to consider whether Dr. Tomsik's opinion was entitled to controlling weight and by failing to identify any specific evidence that was inconsistent with Dr. Tomsik's opinion.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  _Wilson v. Comm'r of Soc. Sec._, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence. _Bogle v. Sullivan_, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  _See Wilson_, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," _Bowie v. Comm'r of Soc. Sec._, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, _Wilson_, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and

15

the appropriate remedy is remand.  *Id.*

Here, the ALJ considered Dr. Tomsik to be Plaintiff's treating physician, as he specifically referred to Dr. Tomsik as Plaintiff's "primary care physician" (Tr. 17), but did not give controlling weight to Dr. Tomsik's November 2011 opinion.  (*Id.*)  Instead, the ALJ assigned "less weight" to Dr. Tomsik's opinion, because "the evidence of record including the treatment notes does not support it."  (*Id.*)  If this were all the ALJ had said about the evidence, the case would require remand.[2]

In this case, however, the ALJ's opinion, taken as a whole, thoroughly evaluates the evidence and indicates the weight the ALJ gave it.  This provides a sufficient basis for the ALJ's rejection of Dr. Tomsik's opinion, *see Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), and affords this Court the opportunity to meaningfully review the ALJ's opinion.  In *Nelson*, the ALJ failed to discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued that this failure constituted a basis for remand.  The Sixth Circuit disagreed, concluding that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both the supportability of [the treating physicians'] opinions and the consistency of those opinions with the rest of the record evidence."  195 F. App'x at 470.  Because the ALJ's

---

[2]     There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand.  *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

16

discussion of the other evidence "implicitly provided sufficient reasons for not giving . . . controlling weight" to the treating physicians, the Sixth Circuit concluded that the ALJ's decision satisfied the purposes of the controlling physician rule.  *Id.* at 472.

In this case, the ALJ provided a lengthy discussion of the medical evidence before evaluating the opinions of the treating physician and the other medical opinions contained in Plaintiff's record.  (Tr. 14-17.)  The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather, the ALJ analyzed the medical evidence and explained how it supported his ultimate RFC determination.  (*Id.*)  For example, the ALJ discussed the following evidence, which implicitly rejects Dr. Tomsik's opinion regarding Plaintiff's physical limitations:

- At an October 2010 physical consultative examination by Dr. Saghafi, Plaintiff did not need or use an ambulatory aid.  (Tr. 15.)  An examination revealed that his back had no gross deformity and was tender to palpation, his reflexes were normal, there were no muscle spasms in the back, and straight leg raising was negative for spinal cord or nerve root impingement.  (*Id.*)

- Plaintiff was making progress at physical therapy and his rehabilitation potential was "good," but he failed to appear at two physical therapy appointments, cancelled two others, and then failed to return.  (Tr. 16.)

- X-rays of Plaintiff's right shoulder on August 23, 2010, were normal.  (*Id.*)

- Plaintiff was not as limited as he claimed, as he was able to get around by riding a bicycle, he looked for work on the computer, and he could take care of his personal needs.  (*Id.*)

- Plaintiff found relief with Daypro, Lidoderm patches, and a heating pad.  (*Id.*) Cortisone and Kenalog injections helped with his shoulder pain.  (*Id.*)

- Plaintiff was able to do construction work – which he described as walking/standing for eight hours of the workday, handling large objects six hours of the workday, and lifting up to 100 pounds or more at times – despite his neck pain, back, pain, and migraines.  (*Id.*) Plaintiff's record did not contain evidence of "an intervening trauma or some other plausible

17

explanation for such a decrease in his physical functioning."  (*Id.*)  As a result, the ALJ concluded that Plaintiff's allegations of disabling physical symptoms and pain were not consistent with his most recent work history. (*Id.*)

• Plaintiff testified that his medications caused dizziness and sweating, but his medical records failed to show that he informed his doctor of such side effects on a routine basis.  (*Id.*)

Had the ALJ discussed the aforementioned evidence immediately after stating that he was rejecting Dr. Tomsik's opinion, there would be no question that the ALJ provided "good reasons" for giving Dr. Tomsik's opinion less than controlling weight. (Tr. 17.)  The fact that the ALJ did not analyze the medical evidence for a second time (or refer to his previous analysis) when rejecting Dr. Tomsik's opinion does not necessitate remand of Plaintiff's case.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).  Accordingly, Plaintiff's first assignment of error is without merit.

### b.    The ALJ's Residual Functional Capacity Finding Did Not Accurately Account for Plaintiff's Limitations.

Plaintiff argues that the ALJ did not accurately account for his limitations when formulating Plaintiff's residual functional capacity ("RFC").  Specifically, Plaintiff

18

contends that the ALJ failed to fully and fairly assess the limitations resulting from Plaintiff's degenerative disc disease of the cervical and lumbar spine and his severe headaches. The Commissioner responds that substantial evidence supports the ALJ's RFC determination. For the following reasons, Plaintiff's argument is without merit.

RFC is an indication of a claimant's work related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.945(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

Here, the ALJ concluded that Plaintiff had the RFC to perform a range of light work[3] with certain additional limitations. (Tr. 14.) Plaintiff argues that the ALJ's RFC does not adequately reflect the limitations resulting from Plaintiff's degenerative disc disease and severe headaches. In making this argument, Plaintiff notes that he testified about the pain and other symptoms he experiences due to his condition, and contends that his allegations are supported by clinical and diagnostic testing. While it is true that Plaintiff testified about his symptoms and limitations, the ALJ concluded that Plaintiff's statements were not credible to the extent that his limitations are inconsistent

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R § 404.1567.

with the ALJ's RFC assessment. (Tr. 15.) Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983). The ALJ also must provide an adequate explanation for his credibility determination. "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a two-step test known as the "Duncan Test" to determine the credibility of such complaints. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain. *Id.* Second, if there is such an underlying medical condition, the Commissioner must

examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain. *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors.[4]  *See Felisky,* 35 F.3d at 1039–40 (citing 20 C.F.R. § 404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not all, of the relevant factors in his assessment of Plaintiff's condition.  (Tr. 14-18.)  The ALJ examined Plaintiff's daily activities, his treatments and his responses to those treatments, the clinical examination findings, and the physician statements of record. (*Id.*)  Thus, the ALJ considered the relevant evidence.

Moreover, in assessing Plaintiff's complaints of pain, the ALJ determined that

---

[4] These factors include the following:
(1) the claimant's daily activities;
(2) the location, duration, frequency, and intensity of the claimant's alleged pain;
(3) precipitating and aggravating factors;
(4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;
(5) treatments other than medication that the claimant has received to relieve the pain; and
(6) any measures that the claimant takes to relieve his pain.

21

Plaintiff's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms were not credible to the extent that they were inconsistent with his RFC.  (Tr. 15.)  Thus, the ALJ did not reject Plaintiff's subjective complaints altogether; rather, he determined that his RFC assessment adequately accounted for Plaintiff's limitations based on a careful consideration of the evidence.  For example, the ALJ noted:

> While the claimant is somewhat limited by his physical impairments and pain, I conclude that he is not as limited as he claims.  He gets around by riding a bicycle (Exs. 1F, p. 7 and 4F, p. 2).  He goes to the library to read the newspaper and to use the Internet, including looking for work on the computer (Ex. 4F, p. 5).  He takes care of personal needs (Ex. 4F, p. 6).
>
> The claimant finds relief with Daypro, Lidoderm patches, and a heating pad (Ex. 12F, p. 16).  Cortisone and Kenalog injections help with his shoulder pain (Exs. 2F, p. 8 and 12F, p. 24).
>
> * * *
>
> From 1996 to 2009, the claimant did construction work, which he described as walking/standing for 8 hours of the workday, handling large objects 6 hours of the workday, and lifting 10 pounds frequently but up to 100 pounds or more at times (see Exhibit 2E, p. 3-4).  He was able to do this work despite his neck pain, back pain, and migraines.  There being no evidence of an intervening trauma or some other plausible explanation for such a decrease in his physical functioning, I conclude that the claimant's allegations of disabling physical symptoms and disabling pain are not consistent with his most recent work history and are consistent with the residual functional capacity stated above.

(Tr. 16.)  Thus, the ALJ specifically compared Plaintiff's alleged symptoms to other evidence in the record and found that Plaintiff's subjective complaints were inconsistent with the objective evidence.  This inconsistency is an appropriate basis for an adverse credibility finding.  *See Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility . . . is appropriate where an ALJ finds contradictions

22

among the medical reports, claimant's testimony, and other evidence.")  As a result, the ALJ did not err in finding that Plaintiff is capable of engaging in light work, because the ALJ adequately explained why Plaintiff's statements concerning his symptoms were not credible to the extent they were inconsistent with his RFC.

Furthermore, to the extent Plaintiff argues that the ALJ did not adequately consider the objective findings supporting Plaintiff's allegations of pain, this argument is not well taken.  Plaintiff notes that an MRI of his cervical spine revealed extensive degenerative changes including moderate severe spinal stenosis at C5-6 and C7-T1 and mild to moderate spinal stenosis at C2-3, C3-4, C4-5, and C6-7.  (Tr. 329-330.)  Plaintiff also notes that examinations by Dr. Saghafi and Dr. Tomsik have revealed tenderness and decreased range of motion.  (Tr. 340, 344, 394-395.)  Plaintiff does not, however, explain how this evidence supports a more restrictive RFC than the one found by the ALJ.  It is well established that the "mere diagnosis" of a condition "says nothing" about its severity or its effect on a claimant's ability to perform work.  *Higgs v. Bowen,* *880 F.2d 860, 863 (6th Cir. 1988).*  Thus, the fact that a physician diagnosed Plaintiff with degenerative disc disease or migraines did not, alone, require the ALJ to include limitations specifically related to those diagnoses in Plaintiff's RFC.  When determining Plaintiff's RFC, the ALJ specifically discussed Plaintiff's MRI results as well as Drs. Saghafi and Tomsik's findings of tenderness and decreased range of motion.  (Tr. 15, 17.)  Nonetheless, the ALJ concluded that, despite his limitations, Plaintiff was capable of performing light work.  (Tr. 14.)

Treating physician Dr. Tomsik indicated not only that Plaintiff has a diagnosed impairment, but also that he had associated functional limitations that could render him

disabled. (Tr. 485-486.) The ALJ did not include such limitations in Plaintiff's RFC, however, because the ALJ gave "less weight" to Dr. Tomsik's opinion. As addressed in the previous discussion of Plaintiff's first assignment of error, the ALJ provided "good reasons" for rejecting this opinion. The ALJ provided a detailed analysis of the medical evidence, showing how the evidence supported the ALJ's RFC determination rather than Dr. Tomsik's more restrictive RFC. Thus, the ALJ did not err by failing to include in Plaintiff's RFC the limitations assessed by Dr. Tomsik. As a result, Plaintiff's second assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: December 17, 2013

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**